USCA1 Opinion

 

 May 25, 1994 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT No. 93-1988 TONY LEE, ET AL., Plaintiffs, Appellants, v. THE LIFE INSURANCE COMPANY OF NORTH AMERICA, Defendants, Appellees. ____________________ ERRATA SHEET The opinion of this Court issued on May 4, 1994, is amended as follows: Cover sheet: ___________ Jay S. Goodman for The University of Rhode Island, et al. ______________ William P. Devereaux and McGovern, Noel & Benik, Inc. on _____________________ ______________________________ brief for The Life Insurance Company of North America. Phillip A. Proger, with whom Gregory A. Castanias and Jones, _________________ ____________________ ______ Day, Reavis & Pogue were on brief for The Life Insurance ____________________ Company of North America, and for all appellees on antitrust issues. UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1988 TONY LEE, ET AL., Plaintiffs, Appellants, v. THE LIFE INSURANCE COMPANY OF NORTH AMERICA, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Raymond J. Pettine, Senior U.S. District Judge] __________________________ ____________________ Before Torruella, Circuit Judge, _____________ Aldrich, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ Jay S. Goodman for The University of Rhode Island, et al. ______________ William P. Devereaux and McGovern, Noel & Benik, Inc. on _____________________ _____________________________ brief for The Life Insurance Company of North America. Phillip A. Proger, with whom Gregory A. Castanias and Jones, _________________ ____________________ ______ Day, Reavis & Pogue were on brief for The Life Insurance ____________________ Company of North America, and for all appellees on antitrust issues. ____________________ May 4, 1994 ____________________ CYR, Circuit Judge. Three University of Rhode Island CYR, Circuit Judge. ______________ ("URI") students appeal from a district court order dismissing their federal antitrust, equal protection, and due process claims against URI, its Board of Governors, three URI officials, and URI's student-health insurer, Life Insurance Company of North America ("LINA"). Finding no error, we affirm the district court judgment. I I BACKGROUND BACKGROUND __________ As a precondition to reregistering each semester, URI requires all full-time undergraduate students to pay a fixed fee for the right to use URI's on-campus, walk-in medical clinic, University Health Services ("UHS").1 All students who pay the UHS clinic fee must also carry supplemental health insurance coverage for certain medical services, such as x-rays, lab tests and gynecological tests, that are available through UHS. Two supplemental insurance options are available. First, the student may obtain supplemental insurance through LINA, a private health care underwriter which URI sponsors as its "default" insurer. LINA purportedly "dovetails" its supplemental coverage so that the insured student pays an annual premium that minimizes dupli- cative coverage; that is, it lessens the risk that the LINA _______ premium and the UHS clinic fee will reflect redundant coverage ____________________ 1Graduate students are not required to pay the UHS clinic fee, provided they have health insurance coverage that meets URI's requirements. for the same medical procedures.2 As a second option, students ____ may secure "comparable [supplemental] coverage" from an off- campus health care insurer of their choice, except that URI does not consider either Rhode Island Blue Cross or Rhode Island-based HMOs "comparable coverage." Students who do not opt out of the LINA "default" coverage by a specified deadline are automatically billed for the annual LINA premium, and cannot reregister for the following semester until the LINA premium has been paid. The automatic "default" scheme notwithstanding, only about 40% of the students who pay the UHS clinic fee insure through LINA. Appellants initiated this class action in federal district court against URI and LINA in January 1992. The amended complaint alleges that the practice of conditioning continued matriculation at URI on payment of the UHS clinic fee and/or the LINA supplemental insurance premium violates the Sherman Anti- trust Act, 15 U.S.C. 1 (1993), as well as the equal protection and due process guarantees under the United States Constitution. Following minimal discovery, URI and LINA moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6),3 and the district court dismissed all claims. Lee v. Life Ins. Co. of N.A., 829 F. Supp. ___ _____________________ ____________________ 2LINA coverage requires the student to present for treatment at UHS in the first instance, pending possible referral to an _____ outside health care provider. 3Appellants' motion for class certification was stayed pending disposition of appellees' motions to dismiss. 4 529 (D.R.I. 1993).4 II II DISCUSSION DISCUSSION __________ A. The Antitrust "Tying" Claim A. The Antitrust "Tying" Claim ___________________________ Appellants challenge the dismissal of their claim that the URI health care-insurance scheme is an impermissible "tying" arrangement in violation of the Sherman Act, 15 U.S.C. 1 (1993) ("Every contract . . . in restraint of trade or commerce . . . is hereby declared to be illegal."). See Eastman Kodak Co. v. Image ___ _________________ _____ Technical Servs., Inc., 112 S.Ct. 2072 (1992) ("Kodak"). "A _______________________ _____ tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a differ- ent (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" Id. at 2079 ___ (quoting Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5-6 _____________________ _____________ (1958)). Generally speaking, an impermissible "tie-in" occurs if a seller (viz., URI) enjoys either a monopoly or "appreciable ____ economic power" ("AEP") in the "tying" product (or service) market, and uses its considerable market leverage to "coerce" a buyer already intent on purchasing the tying product from the seller into buying a second, "tied" product that the buyer would not have bought based solely on the quality or price of the tied product itself. See Fortner Enters., Inc. v. United States ___ _____________________ _____________ ____________________ 4At the same time, the district court declined to exercise jurisdiction over several pendent state-law claims, see 28 U.S.C. ___ 1367(c)(3) (1993). Cf. infra note 11. ___ _____ 5 Steel Corp., 394 U.S. 495, 503 (1969); see generally Grappone, ___________ ___ _________ _________ Inc. v. Subaru of New England, Inc., 858 F.2d 792, 794-96 (1st ____ ____________________________ Cir. 1988) (describing procompetitive policy interests animating per se tying analysis).5 Since many product "ties" may not ___ __ prove anti-competitive, notwithstanding their somewhat misleading epithet, "per se" tie-ins may require a "fairly subtle antitrust ___ __ analysis" of "market power," a fact-intensive inquiry aimed at winnowing out only those ties most likely to threaten anti- competitive harm. Id. at 795. ___ Appellants claim three "product" tie-ins: (1) between a university education (URI) and health insurance coverage (LINA); (2) between health care services (UHS) and health insur- ance coverage (LINA); and (3) between a university education (URI) and health care services (UHS).6 We agree with the ____________________ 5The tie-in must also affect a substantial volume of com- merce in the tied market, see Kodak, 112 S. Ct. at 2079, a factor ___ _____ not at issue in this case. Further, we assume, without deciding, _______ ________ that URI is a participant in the insurance "market," for anti- trust purposes, simply because it receives a one-time $10 processing fee for each LINA policy sold to a URI student. 6Notwithstanding certain misgivings, we further assume, without deciding, that the amended complaint adequately pleads _______ ________ two other essential "tying" claim elements. These assumptions merely facilitate clearer focus on the core deficiency in appel- lants' antitrust claim. First, we presume that the products at issue are distinct, i.e., that each is distinguishable by consum- ____ ers in the relevant market, and that there would be sufficient consumer demand for each individual product, and not merely as __________ part of an integrated product "package." See Jefferson Parish ___ ________________ Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 21-22 (1984). But see id. _________________ ____ ___ ___ ___ at 39 (O'Connor, J., concurring) (noting obvious policy limits of "two product" rule, since almost every product could be broken down into smaller constituent parts that might be sold separate- ly); Lee, 829 F. Supp. at 537 ("I do not believe plaintiffs have ___ adequately alleged that this arrangement involved two separate products."). Second, we accept, arguendo, the questionable ________ 6 district court however, that appellants failed to allege any ___ "tie-in" claim upon which relief could be granted. In particu- lar, appellants failed to advance a colorable claim as to an indispensable element: that URI had AEP in the relevant tying _____________ markets (university education and health care services). AEP or "market power" is the demonstrated ability of a seller "to force a purchaser to do something that he would not do in a competitive market." Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, __________________________________ ____ 14 (1984); see also Grappone, 858 F.2d at 794. AEP may be ___ ____ ________ demonstrated, for example, if the seller holds a monopoly in the tying product (e.g., a patented product), controls a very large ____ share of sales in the tying product market, see id. at 796 (AEP ___ ___ "means significant market power" over an "'appreciable' number of ___________ buyers") (emphasis in original) (citation omitted), or produces a "unique" tying product, and therefore faces no significant competition from functionally similar products or services, see ___ Jefferson Parish, 466 U.S. at 37-38 n.7 (O'Connor, J., concur- _________________ ring) (market must be defined to include "all reasonable substi- tutes for the product"); Grappone, 858 F.2d at 796 (market ________ encompasses all "readily available substitutes"). Appellants can assert no colorable claim that URI holds AEP either in the "tying" market for a university education or in ______ __ the "tying" market for health care services. URI competes for new undergraduate and graduate students on a regional and nation- ____________________ contention that URI students are "coerced" financially into buying LINA coverage because only LINA insurance "dovetails" with UHS clinic fee services. 7 al level with dozens of universities and colleges.7 Although URI obviously is a "unique" institution in a colloquial sense, appellants cannot claim that other institutions of higher educa- tion do not or cannot provide "functionally similar" educational offerings to potential URI applicants. Cf. id. at 798 (brand ___ ___ name alone does not establish product "uniqueness" necessary for AEP). And, of course, absent AEP in the university-education market it is a virtual given that URI cannot enjoy AEP in the student health care business. Appellants attempt to circumvent URI's evident lack of AEP in the two relevant tying markets by contriving a so-called Kodak "lock-in." Kodak involved distinct products: Kodak _____ _____ copiers (the "lock-in" product), Kodak copier replacement parts (the tying product), and Kodak copier servicing and repair (the tied product). In 1985, Kodak began to confine sales of Kodak copier parts to Kodak copier owners who contracted to have their copiers serviced by Kodak, rather than by Kodak's servicing ________ competitors ("ISOs"). Kodak, 112 S.Ct. at 2077-78. Significant- _____ ly, only Kodak parts would fit Kodak copiers. Id. at 2077. The ___ ISOs initiated an antitrust action against Kodak under section 1 of the Sherman Act. After truncated discovery, the district court granted summary judgment for Kodak. Id. at 2078. The ___ Ninth Circuit reversed, Kodak, 903 F.2d 612, 617 (9th Cir. 1990), _____ and the Supreme Court affirmed, Kodak, 112 S. Ct. at 2092. _____ ____________________ 7As of 1991, for example, Rhode Island residents comprised only 56% of the URI student body. 8 By reason of Kodak's very small market share in copier sales, the parties had stipulated that Kodak had no AEP in the copier market (assuming copier sales to be the relevant "tying" ________ market), and hence, no unlawful "tie" could exist between Kodak copiers and Kodak parts-servicing. Id. at 2081 n.10. The ___ Supreme Court accordingly focused on whether an unlawful tie-in nonetheless existed between Kodak parts and Kodak servicing. Id. _____ _________ ___ Kodak argued for the view that, either presumptively or as a matter of law, vigorous competition in the copier market would prevent Kodak from raising its parts and servicing contract prices above competitive levels, because any such price increases in these "derivative aftermarkets" would become known to copier- equipment consumers, and eventually cause Kodak to lose ground to ____ its competitors in copier sales. Id. at 2081-82, 2083. ___ The Court rejected Kodak's per se "cross-elasticity of ___ __ demand" theory, identifying two different fact patterns which, if ___ borne out by the evidence, might support a reasonable inference that parts and servicing contract price increases would not necessarily cause Kodak to lose copier sales. Under the first scenario, the evidence might demonstrate that a substantial number of consumers, at the time of their original copier pur- chases, would not enjoy cost-efficient8 access to the difficult- to-acquire pricing information needed to evaluate the total ____________________ 8The Court noted that even assuming readily available price information, consumers rationally might decide not to investigate life-cycle costs if investigation would prove more costly than the potential savings. Id. at 2086. ___ 9 "life-cycle" cost of the entire Kodak "package" namely, the price of the copier, likely replacement parts, and product- lifetime servicing. Id. at 2085-87. Under the second scenario, ___ the Court postulated that, in a market for complex durable goods like copiers, current Kodak-copier owners might tolerate even _______ uncompetitive price increases in Kodak parts and servicing as long as the increases did not exceed the costs of abandoning their original investment in the Kodak copier and switching, for example, to a Canon or Xerox copier. Id. at 2087-88. Since ___ Kodak's servicing competitors had produced some evidence of "very high" switching costs for Kodak copier owners, the Court opined that such "lock-ins" attendant as they are to the original copier purchase could conceivably enable the plaintiff ISOs to establish Kodak's AEP in the derivative "tying" aftermarket for Kodak parts. The Court accordingly concluded that the undeter- mined "information costs" and "switching costs" represented material issues of fact, and if in genuine dispute, would pre- _______ _______ clude summary judgment, even though Kodak lacked AEP in the "lock-in" product market for copiers. Id. at 2086-87. ___ Appellants attempt to shoehorn their allegations into this Kodak "derivative aftermarket" mold, by proposing the _____ following comparative model: first-semester matriculation at URI _____ ________ serves as the "lock-in" product, as did the Kodak copier; subse- quent semesters at URI serve as the tying product, as did Kodak replacement parts; and health clinic services and health insur- ance coverage represent the tied products. Of course, URI, like 10 Kodak, might contend, on summary judgment or at trial, that its lack of AEP in the locked-in product market ("sales" of first- semester university education) creates a "cross-elasticity of demand," which would prevent health clinic fees and LINA supple- mental insurance premiums from being increased to uncompetitive levels. Nevertheless, because Kodak was a summary judgment case, _____ _______ ________ rather than a Rule 12(b)(6) case, appellants argue that they did enough to withstand URI's motion to dismiss simply by alleging the existence of unspecified "information" and "switching" costs, ___________ which must be credited for Rule 12(b)(6) purposes. See Rumford ___ _______ Pharmacy, Inc. v. City of East Providence, 970 F.2d 996, 997 (1st ______________ _______________________ Cir. 1992) (review of Rule 12(b)(6) dismissal is de novo, credit- __ ____ ing all allegations in the complaint and drawing all reasonable inferences favorable to plaintiff). Appellants challenge the district court ruling that their "information cost" allegations were insufficient to defeat the motion to dismiss. First, appellants argue that URI cannot posit a "cross-elasticity of demand" in the present context because the prices charged for health clinic services and insur- ance premiums are too insignificant in relation to tuition and other university-education costs to be considered a meaningful factor in determining whether potential applicants for admission will attend URI or some other university. Alternatively, appel- lants argue that URI would bear the burden of proof on this issue at trial, and that on appeal it has not pointed to supportive evidence of consumer "sophistication." 11 Appellants exaggerate the role that summary-judgment burden shifting played in the Kodak analysis. Kodak simply _____ _____ pointed out that summary judgment was not yet in order on Kodak's ___ "cross-elasticity of demand" theory (1) in light of the plaintiff ISOs' proffer on "information costs" i.e., readily inferable ____ _______ _________ expenses associated with accumulating technical information relating to the costs of equipment, parts, and servicing over the lifetime of a "complex durable goods" item, and (2) in the ___ absence of any conclusive evidence from Kodak that a substantial number of purchasers actually make accurate prepurchase assess- ________ ments of the life-cycle "package" price of their Kodak copiers. Thus, the Court neither discussed any reallocation of burdens of proof at trial, nor in any way intimated a shift in the eviden- _____ tiary burden of proof on the factual issues of "information costs" and "lock-in." See, e.g., Jefferson Parish, 466 U.S. at ___ ____ ________________ 13-14 (assuming burden of proof rests with plaintiff to show AEP in tying-product market); Town Sound and Custom Tops, Inc. v. __________________________________ Chrysler Motors Corp., 959 F.2d 468, 479 n.12 (3d Cir.) (plain- _____________________ tiff bears burden of proof on "tying market" definition), cert ____ denied, 113 S. Ct. 196 (1992). In order to withstand URI's ______ motion to dismiss for failure to state a claim, therefore, it was appellants' burden (absent any colorable claim that URI had AEP in the locked-in product markets for university education and student health services) to allege "information costs" which ______ would prevent a substantial number of URI students from accurate- ly assessing the total costs of a URI education, including health 12 clinic fees and insurance premiums, in determining whether to matriculate at URI. Second, appellants argue that it is impossible to allege "information costs" because potential URI applicants cannot know or predict their future URI health clinic fees and LINA insurance premiums with any precision, since URI and LINA reserve the right to increase these charges each year. But appellants mistake the focus of the Court's concerns about the "information costs" in Kodak. _____ In Kodak, the information required by the customer _____ pertained to the life-cycle pricing of a Kodak copier "package," information so patently "difficult and costly" to come by that it spontaneously gave rise to a reasonable inference that unsoph- isticated consumers would not have the information needed to evaluate their options at the time they made their decision to purchase a Kodak copier. Kodak, 112 S. Ct. at 2085.9 By con- _____ ____________________ 9The Kodak Court elaborated on the complexity of the "infor- _____ mation" needed to make an informed investment: In order to arrive at an accurate price, a consumer must acquire a substantial amount of raw data and undertake sophisticated analysis. The necessary infor- mation would include data on price, quality, and avail- ability of products needed to operate, upgrade, or enhance the initial equipment, as well as service and repair costs, including estimates of breakdown frequen- cy, nature of repairs, price of service and parts, length of "down-time" and losses incurred from down- time. Much of this information is difficult some of it is impossible to acquire at the time of pur- chase. During the life of a product, companies may change the service and parts prices, and develop prod- ucts with more advanced features, a decreased need for repair, or new warranties. In addition, the informa- 13 trast, before signing up for their first semester at URI, stu- dents are informed that their continued matriculation at URI is conditioned, inter alia, on their "purchase" of health clinic _____ ____ services at a stated annual fee, subject to historically predict- able annual increases, and on their purchase of supplemental insurance coverage.10 See Philip E. Areeda & Herbert Hoven- ___ kamp, Antitrust Law 1709.2, at 1174 (Supp. 1993) (Kodak does _____________ _____ not focus on potential exploitation of the "irrational or fool- ish" purchaser, but the purchaser who makes the rational decision that comparative-shopping costs would outweigh any savings from a fully informed purchase; "the [Kodak] context was confined to _____ hard-to-obtain information") (emphasis added); cf. id. at 1174 ______________ ___ ___ ("[R]elevant information need not be so comprehensive as a binding future price schedule . . . ."); see also supra note 8. ___ ____ _____ ____________________ tion is likely to be customer specific; lifecycle costs will vary from customer to customer with the type of equipment, degrees of equipment use, and costs of down- time. Kodak, 112 S.Ct. at 2085-86. _____ 10Considering the recent hyperinflationary trends in the health care industry as a whole, UHS clinic fees have increased at fairly predictable increments since 1987: 1987-88 ($179); 1988-89 ($188); 1989-90 ($200.50); 1990-91 ($227); 1991-92 ($248); 1992-93 ($312). LINA premiums have increased comparably over the same period, from $158 in 1987-88 to $369 in 1992-93. The record contains no evidence that prospective URI applicants would have great difficulty gaining access to this information from any number of reliable sources (e.g., URI application ____ materials, URI admissions officials, past or current URI stu- dents, college entrance source books). Nor do appellants suggest that URI had any incentive to conceal the scope of past price increases. On the billing invoices it mails to students, URI routinely individualizes its charges for registration, tuition, UHS fees, LINA premiums, and taxes. 14 Appellants have made no allegations sufficient to give rise to a reasonable inference that the health-care and insurance-cost information needed to make an informed decision whether to accept the preconditions to continued matriculation at URI is either ______ difficult or expensive to obtain or correlate. _________ __ _________ __ ______ __ _________ The district court further ruled that appellants failed to state an actionable claim that they were "locked in"; that is, they failed to plead actual costs associated with switching from URI after their first semester. Although appellants now assert that they can amend their complaint to allege such costs, we conclude that further amendment to allege specific "switching costs" would be futile. See University of Rhode Island v. A.W. ___ ___________________________ ____ Chesterton Co., 2 F.3d 1200, 1219 n. 20 (1993). ______________ First, there is an important distinction between Kodak _____ and the present case. Kodak was a "derivative aftermarket" case _____ involving "complex durable goods." Unlike the copier parts in Kodak, subsequent URI semesters are not "derivative aftermarket" _____ components upon which the buyer's initial investment absolutely depends. As the Supreme Court noted, Kodak copiers are "expen- sive when new," incompatible with replacement parts used in other copiers, and retain "little resale value" presumably because complex durable goods depreciate so rapidly. Kodak, 112 S.Ct. at _____ 2077. The "lock-in" would occur provided it could be shown that Kodak copier owners must either purchase replacement parts from Kodak or abandon their initial, unamortized investment in their ___________ __________ Kodak copier. In contrast, a completed first semester at univer- 15 sity is discretely priced students do not pay for their entire four-year stint in advance and the "college credit" value of the first semester is neither nontransferable nor without econom- ic or educational value in the future even if the student does not remain at URI. Thus, appellants' attempt to extend Kodak, _____ beyond the "derivative aftermarket" context to the educational context, is problematic at best. Second, the timing of the "lock-in" at issue in Kodak ______ _____ was central to the Supreme Court's decision. Unsophisticated Kodak copier owners were destined for "lock-in" from the moment ____ ___ ______ they purchased their Kodak copiers. At the time current Kodak ____ _________ _____ _____ _______ copier owners bought their copiers, Kodak had not yet conditioned its sale of replacement parts on the purchase of Kodak servicing, and its later-announced policy to that effect was made applicable both to prospective and existing Kodak copier owners. Had ___ ________ previous customers known, at the time they bought their Kodak copiers, that Kodak would implement its restrictive parts-servic- ing policy, Kodak's "market power," i.e., its leverage to induce ____ customers to purchase Kodak servicing, could only have been as significant as its AEP in the copier market, which was stipulated ______ ______ to be inconsequential or nonexistent. See Kodak, 112 S.Ct. at ___ _____ 2095-96 (Scalia, J., dissenting) (noting that even the Kodak _____ majority probably would have found no "lock-in" had Kodak an- nounced its parts-service "tie" at the time of its market entry); see generally Philip E. Areeda, supra, 1709.2, at 1164-68 ___ _________ _____ (same). In the instant case, however, students know before their 16 matriculation that they are buying a URI "package" that includes at least two "tied" products a URI education and on-campus health care services and insurance. As appellants failed to assert a colorable claim that URI had AEP in the primary (univer- sity education) market, no Kodak-type "lock-in" could have _____ occurred in subsequent semesters, and even the most detailed allegations of "switching costs" would be wholly unavailing. 17 B. The "Due Process" and "Equal Protection" Claims B. The "Due Process" and "Equal Protection" Claims _______________________________________________ Appellants attempt to raise two vaguely articulated constitutional challenges to the URI health services-insurance scheme. First, they argue that URI's conditioning of continued matriculation on the payment of a health clinic fee violates their constitutional right to procedural due process, by depriv- ing them of a property interest (fees and premiums), and a liberty-privacy interest (the alleged right to retain a physician of one's choice). Unsurprisingly, appellants cite no case authority for either contention, nor have we found any.11 Appellants purchased a "product"-"service" from URI with full knowledge from the outset that health care fees and supplemental ____________________ 11The district court interpreted appellants' complaint as alleging claims based on substantive due process and the right to contract. Appellants concede that their "cumbersome briefing" contributed to this understanding, yet did not move for recon- sideration. See Vanhaaren v. State Farm Mut. Auto. Ins. Co., 989 ___ _________ ______________________________ F.2d 1, 4-5 (1st Cir. 1993) (issues raised for the first time on appeal are deemed waived). Unfortunately, the procedural due process claim asserted on appeal is no less unwieldy. Inexplicably, appellants continue to urge that Rhode Island law disempowered URI from entering the "business" of health care and insurance, and that the LINA policies were merely a fraud or sham affording students no actual coverage. Although these allegations might be material to appellants' ultra vires claim _____ _____ under state law, which the district court dismissed without prejudice, cf. Boston Envtl. Sanitation Inspectors Ass'n v. City ___ __________________________________________ ____ of Boston, 794 F.2d 12, 13 (1st Cir. 1986) (noting that state _________ actor's "[m]ere violation of state statutory requirements does not offend federal constitutional due process"), or conceivably may have served as a basis for some sort of consumer protection claim, appellants do not explain how URI's mere refusal to continue selling them a service (i.e., education) would ____ constitute an actionable "deprivation" of their "property rights" for federal due process purposes. Cf. id. (noting that "an ___ ___ alleged breach of contract [by a state actor] does not amount to a deprivation of property without due process"); Jimenez v. _______ Almodovar, 650 F.2d 363, 370 (1st Cir. 1981) (same). _________ 18 insurance premiums were a required component of the cost. We perceive no procedural infirmity. Second, appellants argue that the URI "package" in- fringes their constitutional right to equal protection of the laws because male and female students matriculating at URI must pay the same health care fees, even though male students will not utilize the UHS gynecological services. The district court aptly found that appellants failed to allege that URI imposed this unitary scheme with any discriminatory animus aimed at male students. See Nieves v. University of Puerto Rico, 7 F.3d 270, ___ ______ __________________________ 276 (1993) (plaintiff contesting classification-neutral statutes on equal protection grounds must proffer not only evidence of disparate effect, but evidence that enactment resulted "because of," rather than "in spite of," classification) (citing Personnel _________ Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 278-80 (1979)); ______________________ ______ Lipsett v. University of Puerto Rico, 864 F.2d 881, 896 (1st Cir. _______ _________________________ 1988). Appellants advance no curative allegations for relieving this infirmity. Affirmed. Affirmed. ________ 19