May 25, 1994 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1988

TONY LEE, ET AL.,

Plaintiffs, Appellants,

v.

THE LIFE INSURANCE COMPANY OF NORTH AMERICA,

Defendants, Appellees.

ERRATA SHEET

The opinion of this Court issued on May 4, 1994, is amended
as follows:

Cover sheet:

Jay S. Goodman for The University of Rhode Island, et al.

William P. Devereaux and McGovern, Noel & Benik, Inc. on

brief for The Life Insurance Company of North America.

Phillip A. Proger, with whom Gregory A. Castanias and Jones,

Day, Reavis & Pogue were on brief for The Life Insurance

Company of North America, and for all appellees on antitrust
issues.

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1988

TONY LEE, ET AL.,

Plaintiffs, Appellants,

v.

THE LIFE INSURANCE COMPANY OF NORTH AMERICA, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Raymond J. Pettine, Senior U.S. District Judge]

Before

Torruella, Circuit Judge,

Aldrich, Senior Circuit Judge,

and Cyr, Circuit Judge.

Jay S. Goodman for The University of Rhode Island, et al.

William P. Devereaux and McGovern, Noel & Benik, Inc. on

brief for The Life Insurance Company of North America.

Phillip A. Proger, with whom Gregory A. Castanias and Jones,

Day, Reavis & Pogue were on brief for The Life Insurance

Company of North America, and for all appellees on antitrust
issues.

May 4, 1994

CYR, Circuit Judge. Three University of Rhode Island
CYR, Circuit Judge.

("URI") students appeal from a district court order dismissing

their federal antitrust, equal protection, and due process claims

against URI, its Board of Governors, three URI officials, and

URI's student-health insurer, Life Insurance Company of North

America ("LINA"). Finding no error, we affirm the district court

judgment.

I

BACKGROUND

As a precondition to reregistering each semester, URI

requires all full-time undergraduate students to pay a fixed fee

for the right to use URI's on-campus, walk-in medical clinic,

University Health Services ("UHS").1 All students who pay the

UHS clinic fee must also carry supplemental health insurance

coverage for certain medical services, such as x-rays, lab tests

and gynecological tests, that are available through UHS. Two

supplemental insurance options are available. First, the student

may obtain supplemental insurance through LINA, a private health

care underwriter which URI sponsors as its "default" insurer.

LINA purportedly "dovetails" its supplemental coverage so that

the insured student pays an annual premium that minimizes dupli-

cative coverage; that is, it lessens the risk that the LINA

premium and the UHS clinic fee will reflect redundant coverage

1Graduate students are not required to pay the UHS clinic
fee, provided they have health insurance coverage that meets
URI's requirements.

for the same medical procedures.2 As a second option, students

may secure "comparable [supplemental] coverage" from an off-

campus health care insurer of their choice, except that URI does

not consider either Rhode Island Blue Cross or Rhode Island-based

HMOs "comparable coverage." Students who do not opt out of the

LINA "default" coverage by a specified deadline are automatically

billed for the annual LINA premium, and cannot reregister for the

following semester until the LINA premium has been paid. The

automatic "default" scheme notwithstanding, only about 40% of the

students who pay the UHS clinic fee insure through LINA.

Appellants initiated this class action in federal

district court against URI and LINA in January 1992. The amended

complaint alleges that the practice of conditioning continued

matriculation at URI on payment of the UHS clinic fee and/or the

LINA supplemental insurance premium violates the Sherman Anti-

trust Act, 15 U.S.C. 1 (1993), as well as the equal protection

and due process guarantees under the United States Constitution.

Following minimal discovery, URI and LINA moved to dismiss

pursuant to Fed. R. Civ. P. 12(b)(6),3 and the district court

dismissed all claims. Lee v. Life Ins. Co. of N.A., 829 F. Supp.

2LINA coverage requires the student to present for treatment
at UHS in the first instance, pending possible referral to an

outside health care provider.

3Appellants' motion for class certification was stayed
pending disposition of appellees' motions to dismiss.

4

529 (D.R.I. 1993).4

II

DISCUSSION

A. The Antitrust "Tying" Claim

Appellants challenge the dismissal of their claim that

the URI health care-insurance scheme is an impermissible "tying"

arrangement in violation of the Sherman Act, 15 U.S.C. 1 (1993)

("Every contract . . . in restraint of trade or commerce . . . is

hereby declared to be illegal."). See Eastman Kodak Co. v. Image

Technical Servs., Inc., 112 S.Ct. 2072 (1992) ("Kodak"). "A

tying arrangement is 'an agreement by a party to sell one product

but only on the condition that the buyer also purchases a differ-

ent (or tied) product, or at least agrees that he will not

purchase that product from any other supplier.'" Id. at 2079

(quoting Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5-6

(1958)). Generally speaking, an impermissible "tie-in" occurs if

a seller (viz., URI) enjoys either a monopoly or "appreciable

economic power" ("AEP") in the "tying" product (or service)

market, and uses its considerable market leverage to "coerce" a

buyer already intent on purchasing the tying product from the

seller into buying a second, "tied" product that the buyer

would not have bought based solely on the quality or price of the

tied product itself. See Fortner Enters., Inc. v. United States

4At the same time, the district court declined to exercise
jurisdiction over several pendent state-law claims, see 28 U.S.C.

1367(c)(3) (1993). Cf. infra note 11.

5

Steel Corp., 394 U.S. 495, 503 (1969); see generally Grappone,

Inc. v. Subaru of New England, Inc., 858 F.2d 792, 794-96 (1st

Cir. 1988) (describing procompetitive policy interests animating

per se tying analysis).5 Since many product "ties" may not

prove anti-competitive, notwithstanding their somewhat misleading

epithet, "per se" tie-ins may require a "fairly subtle antitrust

analysis" of "market power," a fact-intensive inquiry aimed at

winnowing out only those ties most likely to threaten anti-

competitive harm. Id. at 795.

Appellants claim three "product" tie-ins: (1) between

a university education (URI) and health insurance coverage

(LINA); (2) between health care services (UHS) and health insur-

ance coverage (LINA); and (3) between a university education

(URI) and health care services (UHS).6 We agree with the

5The tie-in must also affect a substantial volume of com-
merce in the tied market, see Kodak, 112 S. Ct. at 2079, a factor

not at issue in this case. Further, we assume, without deciding,

that URI is a participant in the insurance "market," for anti-
trust purposes, simply because it receives a one-time $10
processing fee for each LINA policy sold to a URI student.

6Notwithstanding certain misgivings, we further assume,
without deciding, that the amended complaint adequately pleads

two other essential "tying" claim elements. These assumptions
merely facilitate clearer focus on the core deficiency in appel-
lants' antitrust claim. First, we presume that the products at
issue are distinct, i.e., that each is distinguishable by consum-

ers in the relevant market, and that there would be sufficient
consumer demand for each individual product, and not merely as

part of an integrated product "package." See Jefferson Parish

Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 21-22 (1984). But see id.

at 39 (O'Connor, J., concurring) (noting obvious policy limits of
"two product" rule, since almost every product could be broken
down into smaller constituent parts that might be sold separate-
ly); Lee, 829 F. Supp. at 537 ("I do not believe plaintiffs have

adequately alleged that this arrangement involved two separate
products."). Second, we accept, arguendo, the questionable

6

district court however, that appellants failed to allege any

"tie-in" claim upon which relief could be granted. In particu-

lar, appellants failed to advance a colorable claim as to an

indispensable element: that URI had AEP in the relevant tying

markets (university education and health care services). AEP or

"market power" is the demonstrated ability of a seller "to force

a purchaser to do something that he would not do in a competitive

market." Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2,

14 (1984); see also Grappone, 858 F.2d at 794. AEP may be

demonstrated, for example, if the seller holds a monopoly in the

tying product (e.g., a patented product), controls a very large

share of sales in the tying product market, see id. at 796 (AEP

"means significant market power" over an "'appreciable' number of

buyers") (emphasis in original) (citation omitted), or produces a

"unique" tying product, and therefore faces no significant

competition from functionally similar products or services, see

Jefferson Parish, 466 U.S. at 37-38 n.7 (O'Connor, J., concur-

ring) (market must be defined to include "all reasonable substi-

tutes for the product"); Grappone, 858 F.2d at 796 (market

encompasses all "readily available substitutes").

Appellants can assert no colorable claim that URI holds

AEP either in the "tying" market for a university education or in

the "tying" market for health care services. URI competes for

new undergraduate and graduate students on a regional and nation-

contention that URI students are "coerced" financially into
buying LINA coverage because only LINA insurance "dovetails" with
UHS clinic fee services.

7

al level with dozens of universities and colleges.7 Although

URI obviously is a "unique" institution in a colloquial sense,

appellants cannot claim that other institutions of higher educa-

tion do not or cannot provide "functionally similar" educational

offerings to potential URI applicants. Cf. id. at 798 (brand

name alone does not establish product "uniqueness" necessary for

AEP). And, of course, absent AEP in the university-education

market it is a virtual given that URI cannot enjoy AEP in the

student health care business.

Appellants attempt to circumvent URI's evident lack of

AEP in the two relevant tying markets by contriving a so-called

Kodak "lock-in." Kodak involved distinct products: Kodak

copiers (the "lock-in" product), Kodak copier replacement parts

(the tying product), and Kodak copier servicing and repair (the

tied product). In 1985, Kodak began to confine sales of Kodak

copier parts to Kodak copier owners who contracted to have their

copiers serviced by Kodak, rather than by Kodak's servicing

competitors ("ISOs"). Kodak, 112 S.Ct. at 2077-78. Significant-

ly, only Kodak parts would fit Kodak copiers. Id. at 2077. The

ISOs initiated an antitrust action against Kodak under section 1

of the Sherman Act. After truncated discovery, the district

court granted summary judgment for Kodak. Id. at 2078. The

Ninth Circuit reversed, Kodak, 903 F.2d 612, 617 (9th Cir. 1990),

and the Supreme Court affirmed, Kodak, 112 S. Ct. at 2092.

7As of 1991, for example, Rhode Island residents comprised
only 56% of the URI student body.

8

By reason of Kodak's very small market share in copier

sales, the parties had stipulated that Kodak had no AEP in the

copier market (assuming copier sales to be the relevant "tying"

market), and hence, no unlawful "tie" could exist between Kodak

copiers and Kodak parts-servicing. Id. at 2081 n.10. The

Supreme Court accordingly focused on whether an unlawful tie-in

nonetheless existed between Kodak parts and Kodak servicing. Id.

Kodak argued for the view that, either presumptively or as a

matter of law, vigorous competition in the copier market would

prevent Kodak from raising its parts and servicing contract

prices above competitive levels, because any such price increases

in these "derivative aftermarkets" would become known to copier-

equipment consumers, and eventually cause Kodak to lose ground to

its competitors in copier sales. Id. at 2081-82, 2083.

The Court rejected Kodak's per se "cross-elasticity of

demand" theory, identifying two different fact patterns which, if

borne out by the evidence, might support a reasonable inference

that parts and servicing contract price increases would not

necessarily cause Kodak to lose copier sales. Under the first

scenario, the evidence might demonstrate that a substantial

number of consumers, at the time of their original copier pur-

chases, would not enjoy cost-efficient8 access to the difficult-

to-acquire pricing information needed to evaluate the total

8The Court noted that even assuming readily available price
information, consumers rationally might decide not to investigate
life-cycle costs if investigation would prove more costly than
the potential savings. Id. at 2086.

9

"life-cycle" cost of the entire Kodak "package" namely, the

price of the copier, likely replacement parts, and product-

lifetime servicing. Id. at 2085-87. Under the second scenario,

the Court postulated that, in a market for complex durable goods

like copiers, current Kodak-copier owners might tolerate even

uncompetitive price increases in Kodak parts and servicing as

long as the increases did not exceed the costs of abandoning

their original investment in the Kodak copier and switching, for

example, to a Canon or Xerox copier. Id. at 2087-88. Since

Kodak's servicing competitors had produced some evidence of "very

high" switching costs for Kodak copier owners, the Court opined

that such "lock-ins" attendant as they are to the original

copier purchase could conceivably enable the plaintiff ISOs to

establish Kodak's AEP in the derivative "tying" aftermarket for

Kodak parts. The Court accordingly concluded that the undeter-

mined "information costs" and "switching costs" represented

material issues of fact, and if in genuine dispute, would pre-

clude summary judgment, even though Kodak lacked AEP in the

"lock-in" product market for copiers. Id. at 2086-87.

Appellants attempt to shoehorn their allegations into

this Kodak "derivative aftermarket" mold, by proposing the

following comparative model: first-semester matriculation at URI

serves as the "lock-in" product, as did the Kodak copier; subse-

quent semesters at URI serve as the tying product, as did Kodak

replacement parts; and health clinic services and health insur-

ance coverage represent the tied products. Of course, URI, like

10

Kodak, might contend, on summary judgment or at trial, that its

lack of AEP in the locked-in product market ("sales" of first-

semester university education) creates a "cross-elasticity of

demand," which would prevent health clinic fees and LINA supple-

mental insurance premiums from being increased to uncompetitive

levels. Nevertheless, because Kodak was a summary judgment case,

rather than a Rule 12(b)(6) case, appellants argue that they did

enough to withstand URI's motion to dismiss simply by alleging

the existence of unspecified "information" and "switching" costs,

which must be credited for Rule 12(b)(6) purposes. See Rumford

Pharmacy, Inc. v. City of East Providence, 970 F.2d 996, 997 (1st

Cir. 1992) (review of Rule 12(b)(6) dismissal is de novo, credit-

ing all allegations in the complaint and drawing all reasonable

inferences favorable to plaintiff).

Appellants challenge the district court ruling that

their "information cost" allegations were insufficient to defeat

the motion to dismiss. First, appellants argue that URI cannot

posit a "cross-elasticity of demand" in the present context

because the prices charged for health clinic services and insur-

ance premiums are too insignificant in relation to tuition and

other university-education costs to be considered a meaningful

factor in determining whether potential applicants for admission

will attend URI or some other university. Alternatively, appel-

lants argue that URI would bear the burden of proof on this issue

at trial, and that on appeal it has not pointed to supportive

evidence of consumer "sophistication."

11

Appellants exaggerate the role that summary-judgment

burden shifting played in the Kodak analysis. Kodak simply

pointed out that summary judgment was not yet in order on Kodak's

"cross-elasticity of demand" theory (1) in light of the plaintiff

ISOs' proffer on "information costs" i.e., readily inferable

expenses associated with accumulating technical information

relating to the costs of equipment, parts, and servicing over the

lifetime of a "complex durable goods" item, and (2) in the

absence of any conclusive evidence from Kodak that a substantial

number of purchasers actually make accurate prepurchase assess-

ments of the life-cycle "package" price of their Kodak copiers.

Thus, the Court neither discussed any reallocation of burdens of

proof at trial, nor in any way intimated a shift in the eviden-

tiary burden of proof on the factual issues of "information

costs" and "lock-in." See, e.g., Jefferson Parish, 466 U.S. at

13-14 (assuming burden of proof rests with plaintiff to show AEP

in tying-product market); Town Sound and Custom Tops, Inc. v.

Chrysler Motors Corp., 959 F.2d 468, 479 n.12 (3d Cir.) (plain-

tiff bears burden of proof on "tying market" definition), cert

denied, 113 S. Ct. 196 (1992). In order to withstand URI's

motion to dismiss for failure to state a claim, therefore, it was

appellants' burden (absent any colorable claim that URI had AEP

in the locked-in product markets for university education and

student health services) to allege "information costs" which

would prevent a substantial number of URI students from accurate-

ly assessing the total costs of a URI education, including health

12

clinic fees and insurance premiums, in determining whether to

matriculate at URI.

Second, appellants argue that it is impossible to

allege "information costs" because potential URI applicants

cannot know or predict their future URI health clinic fees and

LINA insurance premiums with any precision, since URI and LINA

reserve the right to increase these charges each year. But

appellants mistake the focus of the Court's concerns about the

"information costs" in Kodak.

In Kodak, the information required by the customer

pertained to the life-cycle pricing of a Kodak copier "package,"

information so patently "difficult and costly" to come by that it

spontaneously gave rise to a reasonable inference that unsoph-

isticated consumers would not have the information needed to

evaluate their options at the time they made their decision to

purchase a Kodak copier. Kodak, 112 S. Ct. at 2085.9 By con-

9The Kodak Court elaborated on the complexity of the "infor-

mation" needed to make an informed investment:

In order to arrive at an accurate price, a consumer
must acquire a substantial amount of raw data and
undertake sophisticated analysis. The necessary infor-
mation would include data on price, quality, and avail-
ability of products needed to operate, upgrade, or
enhance the initial equipment, as well as service and
repair costs, including estimates of breakdown frequen-
cy, nature of repairs, price of service and parts,
length of "down-time" and losses incurred from down-
time.
Much of this information is difficult some of
it is impossible to acquire at the time of pur-
chase. During the life of a product, companies may
change the service and parts prices, and develop prod-
ucts with more advanced features, a decreased need for
repair, or new warranties. In addition, the informa-

13

trast, before signing up for their first semester at URI, stu-

dents are informed that their continued matriculation at URI is

conditioned, inter alia, on their "purchase" of health clinic

services at a stated annual fee, subject to historically predict-

able annual increases, and on their purchase of supplemental

insurance coverage.10 See Philip E. Areeda & Herbert Hoven-

kamp, Antitrust Law 1709.2, at 1174 (Supp. 1993) (Kodak does

not focus on potential exploitation of the "irrational or fool-

ish" purchaser, but the purchaser who makes the rational decision

that comparative-shopping costs would outweigh any savings from a

fully informed purchase; "the [Kodak] context was confined to

hard-to-obtain information") (emphasis added); cf. id. at 1174

("[R]elevant information need not be so comprehensive as a

binding future price schedule . . . ."); see also supra note 8.

tion is likely to be customer specific; lifecycle costs
will vary from customer to customer with the type of
equipment, degrees of equipment use, and costs of down-
time.

Kodak, 112 S.Ct. at 2085-86.

10Considering the recent hyperinflationary trends in the
health care industry as a whole, UHS clinic fees have increased
at fairly predictable increments since 1987: 1987-88 ($179);
1988-89 ($188); 1989-90 ($200.50); 1990-91 ($227); 1991-92
($248); 1992-93 ($312). LINA premiums have increased comparably
over the same period, from $158 in 1987-88 to $369 in 1992-93.
The record contains no evidence that prospective URI applicants
would have great difficulty gaining access to this information
from any number of reliable sources (e.g., URI application

materials, URI admissions officials, past or current URI stu-
dents, college entrance source books). Nor do appellants suggest
that URI had any incentive to conceal the scope of past price
increases. On the billing invoices it mails to students, URI
routinely individualizes its charges for registration, tuition,
UHS fees, LINA premiums, and taxes.

14

Appellants have made no allegations sufficient to give rise to a

reasonable inference that the health-care and insurance-cost

information needed to make an informed decision whether to accept

the preconditions to continued matriculation at URI is either

difficult or expensive to obtain or correlate.

The district court further ruled that appellants failed

to state an actionable claim that they were "locked in"; that is,

they failed to plead actual costs associated with switching from

URI after their first semester. Although appellants now assert

that they can amend their complaint to allege such costs, we

conclude that further amendment to allege specific "switching

costs" would be futile. See University of Rhode Island v. A.W.

Chesterton Co., 2 F.3d 1200, 1219 n. 20 (1993).

First, there is an important distinction between Kodak

and the present case. Kodak was a "derivative aftermarket" case

involving "complex durable goods." Unlike the copier parts in

Kodak, subsequent URI semesters are not "derivative aftermarket"

components upon which the buyer's initial investment absolutely

depends. As the Supreme Court noted, Kodak copiers are "expen-

sive when new," incompatible with replacement parts used in other

copiers, and retain "little resale value" presumably because

complex durable goods depreciate so rapidly. Kodak, 112 S.Ct. at

2077. The "lock-in" would occur provided it could be shown that

Kodak copier owners must either purchase replacement parts from

Kodak or abandon their initial, unamortized investment in their

Kodak copier. In contrast, a completed first semester at univer-

15

sity is discretely priced students do not pay for their entire

four-year stint in advance and the "college credit" value of

the first semester is neither nontransferable nor without econom-

ic or educational value in the future even if the student does

not remain at URI. Thus, appellants' attempt to extend Kodak,

beyond the "derivative aftermarket" context to the educational

context, is problematic at best.

Second, the timing of the "lock-in" at issue in Kodak

was central to the Supreme Court's decision. Unsophisticated

Kodak copier owners were destined for "lock-in" from the moment

they purchased their Kodak copiers. At the time current Kodak

copier owners bought their copiers, Kodak had not yet conditioned

its sale of replacement parts on the purchase of Kodak servicing,

and its later-announced policy to that effect was made applicable

both to prospective and existing Kodak copier owners. Had

previous customers known, at the time they bought their Kodak

copiers, that Kodak would implement its restrictive parts-servic-

ing policy, Kodak's "market power," i.e., its leverage to induce

customers to purchase Kodak servicing, could only have been as

significant as its AEP in the copier market, which was stipulated

to be inconsequential or nonexistent. See Kodak, 112 S.Ct. at

2095-96 (Scalia, J., dissenting) (noting that even the Kodak

majority probably would have found no "lock-in" had Kodak an-

nounced its parts-service "tie" at the time of its market entry);

see generally Philip E. Areeda, supra, 1709.2, at 1164-68

(same). In the instant case, however, students know before their

16

matriculation that they are buying a URI "package" that includes

at least two "tied" products a URI education and on-campus

health care services and insurance. As appellants failed to

assert a colorable claim that URI had AEP in the primary (univer-

sity education) market, no Kodak-type "lock-in" could have

occurred in subsequent semesters, and even the most detailed

allegations of "switching costs" would be wholly unavailing.

17

B. The "Due Process" and "Equal Protection" Claims

Appellants attempt to raise two vaguely articulated

constitutional challenges to the URI health services-insurance

scheme. First, they argue that URI's conditioning of continued

matriculation on the payment of a health clinic fee violates

their constitutional right to procedural due process, by depriv-

ing them of a property interest (fees and premiums), and a

liberty-privacy interest (the alleged right to retain a physician

of one's choice). Unsurprisingly, appellants cite no case

authority for either contention, nor have we found any.11

Appellants purchased a "product"-"service" from URI with full

knowledge from the outset that health care fees and supplemental

11The district court interpreted appellants' complaint as
alleging claims based on substantive due process and the right to
contract. Appellants concede that their "cumbersome briefing"
contributed to this understanding, yet did not move for recon-
sideration. See Vanhaaren v. State Farm Mut. Auto. Ins. Co., 989

F.2d 1, 4-5 (1st Cir. 1993) (issues raised for the first time on
appeal are deemed waived). Unfortunately, the procedural due
process claim asserted on appeal is no less unwieldy.
Inexplicably, appellants continue to urge that Rhode Island
law disempowered URI from entering the "business" of health care
and insurance, and that the LINA policies were merely a fraud or
sham affording students no actual coverage. Although these
allegations might be material to appellants' ultra vires claim

under state law, which the district court dismissed without
prejudice, cf. Boston Envtl. Sanitation Inspectors Ass'n v. City

of Boston, 794 F.2d 12, 13 (1st Cir. 1986) (noting that state

actor's "[m]ere violation of state statutory requirements does
not offend federal constitutional due process"), or conceivably
may have served as a basis for some sort of consumer protection
claim, appellants do not explain how URI's mere refusal to
continue selling them a service (i.e., education) would

constitute an actionable "deprivation" of their "property rights"
for federal due process purposes. Cf. id. (noting that "an

alleged breach of contract [by a state actor] does not amount to
a deprivation of property without due process"); Jimenez v.

Almodovar, 650 F.2d 363, 370 (1st Cir. 1981) (same).

18

insurance premiums were a required component of the cost. We

perceive no procedural infirmity.

Second, appellants argue that the URI "package" in-

fringes their constitutional right to equal protection of the

laws because male and female students matriculating at URI must

pay the same health care fees, even though male students will not

utilize the UHS gynecological services. The district court aptly

found that appellants failed to allege that URI imposed this

unitary scheme with any discriminatory animus aimed at male

students. See Nieves v. University of Puerto Rico, 7 F.3d 270,

276 (1993) (plaintiff contesting classification-neutral statutes

on equal protection grounds must proffer not only evidence of

disparate effect, but evidence that enactment resulted "because

of," rather than "in spite of," classification) (citing Personnel

Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 278-80 (1979));

Lipsett v. University of Puerto Rico, 864 F.2d 881, 896 (1st Cir.

1988). Appellants advance no curative allegations for relieving

this infirmity.

Affirmed.

19