**GEORGE LUSSIER ENTERPRISES, INC. d/b/a Lussier Subaru, et al.**

v.

**SUBARU OF NEW ENGLAND, INC., et al.**

No. CV–99–109–B.

United States District Court, D. New Hampshire.

Sept. 26, 2003.

---

Richard B. McNamara, Esq., Wiggin & Nourie, Manchester, NH, William A. Ker-shaw, Esq., Kronick Moskovitz Tiedemann & Girard, Sacramento, CA, Allan R. Cu-rhan, Esq., Donovan Hatem LLP, Boston, MA, Timothy A. Gudas, Esq., Sulloway & Hollis, Concord, NH, for plaintiffs.

Michael C. Harvell, Esq., Sheehan Phin-ney Bass & Green, Manchester, NH, Wil-liam A. Kershaw, Esq., Kronick Moskovitz Tiedemann & Girard, Sacramento, CA, Howard M. Cooper, Esq., Todd & Weld, Robert J. Cordy, Esq., Steven W. Kasten, Esq., McDermott Will & Emery, Boston, MA, Ronald L. Snow, Esq., Concord, NH, for defendants.

Russell F. Hilliard, Esq., Upton & Hat-field LLP, Concord, NH, for amicus.

## *MEMORANDUM AND ORDER*

BARBADORO, Chief Judge.

A number of current and former New England Subaru dealers have brought this class action against their distributor, Suba-ru of New England, Inc. ("SNE"), its sole shareholder and President, Ernest Boch, and its Executive Vice President and Gen-eral Manager, Joseph Appelbe. The deal-ers assert that SNE misused its power to control the vehicle allocation process to coerce them to purchase unwanted acces-sories. They also charge that defendants employed other coercive means to induce them to purchase accessories and fraudu-lently concealed SNE's "option-packing" scheme. They claim that defendants vio-lated the Automobile Dealer Day in Court Act ("ADDCA"), various state dealer stat-utes, the Racketeer Influenced Corrupt Organization Act ("RICO"), the Sherman and Clayton antitrust acts, and SNE's dealer contracts. The parties have sub-mitted dueling motions for summary judgement.[1]

---

1. In ruling on these motions, I construe the evidence in the light most favorable to the

## I. BACKGROUND

Subaru automobiles are manufactured by Fuji Heavy Industries, Ltd., and distributed in the United States by Subaru of America, Inc. ("SOA"). Since 1971, SOA has contracted with SNE to serve as its distributor in the New England region. SNE's distribution agreement requires it to purchase a designated number of vehicles from SOA and specifies that SOA may terminate the agreement in certain circumstances if SNE fails to meet its quota. The agreement also obligates SNE to use its best efforts to promote and sell Subaru vehicles and accessories through the use of sales representatives.

SNE has entered into dealership agreements with each Subaru dealership in New England. The dealership agreements incorporate SOA's "Standard Provisions," a document that outlines the general terms and conditions that apply to each dealership. The provisions provide that "it will be necessary for Dealer to order and purchase Cars, subject to availability, in adequate quantities and on a regular periodic basis in order for Dealer to achieve adequate sales performance." Appendix to Defs.' Mot. for Summ. J. (Defs.' App.) at Tab 57, Burbank Aff., Ex. G, ¶ 11.1. They also state, however, that "Subaru Products may not be available to Dealer in sufficient supply from time to time because of production limitations or other factors." *Id.* at ¶ 11.3 In an effort to assure dealers that SNE will allocate vehicles fairly, the provisions require SNE to "allocate all affected Subaru Products equitably, using appropriate factors such as the respective inventory levels and sales performance of Distributor's dealers during a representative period of time immediately prior to such allocation." *Id.* SNE also "has the sole responsibility of performing its obligations ... in a lawful and ethical manner." *Id.* at ¶ 2.2.

### A. *Fair Share II*

From February 1, 1987 until early 2001, SNE used the "Fair Share II Distribution System" to allocate vehicles. Fair Share II's stated purpose was to allocate vehicles "in a manner, that, in SNE's opinion, will maximize the business opportunity for both SNE and its dealers consistent with SNE's desire to allocate vehicles fairly and equitably." *See* Defs.' App. at Tab 60, Eddy Aff., Ex. A. Fair Share II used a formula based largely on past sales performance to allocate most vehicles.

### 1. The Allocation Formula

Fair Share II's allocation formula consisted of fixed and variable components. The fixed component was based on the higher of a dealership's planned sales volume or its average actual sales for the three years subsequent to the adoption of Fair Share II. The variable component was based primarily on a dealer's rate of sales over time. A dealer's "days supply," the number of days it would take the dealer to sell its inventory at its current sales rate, thus was critical to dealers who wished to gain more vehicles in subsequent allocations.[2] SNE used the allocation formula to initially allocate 88.5% of the 124,976 vehicles that SNE sold during the

---

nonmoving parties and enter summary judgment only if the undisputed material facts demonstrate that they are entitled to judgment as a matter of law. *See Navarro v. Pfizer Corp.,* 261 F.3d 90, 94 (1st Cir.2001).

**2.** A dealer's days supply was "calculated every day a sales report [was] generated by taking the total number of vehicles reported ... minus allowable demos. This number [was] divided by the base sales rate established during the most recently concluded two complete industry months." Defs.' App. at Tab 60, Eddy Aff., Ex. A.

class period. *See* Appendix to Pls.' Mot. for Summ. J. (Pls.' App.) at Tab 91, Neels Report, Ex. 2.

### 2. Discretionary Vehicles

Fair Share II initially authorized SNE to withhold up to 10% of each vehicle shipment from the regular allocation process, but SNE later revised the plan to permit it to withhold up to 15% of Legacy models and up to 10% of all other models. Def's App. at Tab 60, Eddy Aff., Ex. A., Ex. F. The plan provided that these "discretionary vehicles" were "to be used as demonstrators by [SNE]; vehicles used for major auto shows; vehicles set aside to assist dealers who, at the sole discretion of [SNE], need assistance; and vehicles delivered to VIPs." *Id.* at Ex. A. Elsewhere, the plan characterized discretionary vehicles as vehicles that were to be used for "purposes such as market action[s]." *Id.* Discretionary vehicles comprised 11.5% of all vehicles distributed by SNE during the class period. Pls.' App. at Tab 91, Neels Report, Ex. 2.

### 3. Turndown Vehicles

SNE's dealers rejected approximately 20% of the vehicles that were initially allocated to them under Fair Share II. *See* Pls.' App. at Tab 89, Neels Aff., Ex. 7. Although Fair Share II did not specify how these "turndown" vehicles should be reallocated, SNE reserved the right to redistribute them to dealers of its choosing.

### B. *Accessories*

SNE distributes vehicles with a variety of accessories that are installed by or at SNE's direction.[3] Vehicles distributed by

SNE during the class period were equipped with more than $53 million in accessories, resulting in an average charge to dealers of $427 per vehicle.[4] *See id.* at Ex. 3.

SNE selected the mix of accessories that were installed on turndown and discretionary vehicles during the class period. While SNE claims that dealers were free to choose whether accessories would be installed on regular allocation vehicles, the dealers assert that SNE used a variety of coercive measures to pressure them to also purchase accessories for these vehicles. During the class period, the average charge to dealers for accessories installed on turndown vehicles was $490 per vehicle, the average charge for accessories installed on discretionary vehicles was $742 per vehicle, and the average charge for accessories installed on regular allocation vehicles was $338 per vehicle. *See id.* at Ex. 2.

SNE derived a significant share of its profit from the sale of accessories. To encourage such sales, it paid its district managers commissions on accessory sales that typically amounted to between 40% and 60% of their total compensation. District managers were not entitled to these commissions unless their average gross profit on such sales met a prescribed target, which initially was $150 but which was later reduced to $140. The $140 target required district managers to average approximately $475 in accessory sales per vehicle in order to earn any accessory-based commission for that period. *See* Pls.' App. at Tab 33, Boch Aff., ¶ 53. SNE also provided district managers with "focus letters" identifying overstocked accessories that they were encouraged to sell.

---

3. Vehicles are also often equipped with accessories installed by Fuji Heavy Industries at the factory. I use the term "accessories" more narrowly to refer only to accessories installed after SNE receives a vehicle from SOA.

4. All dollar values cited in this Memorandum and Order are stated in 2001 dollars.

## C. *Conditioning*

Plaintiffs have produced both statistical and anecdotal evidence to support their contention that SNE required dealers to purchase accessories for regular allocation vehicles in order to obtain access to turndown and discretionary vehicles. Plaintiffs' statistical evidence consists of a multiple regression analysis using data obtained from SNE. Plaintiffs' expert, Dr. Kevin Neels, contends that this analysis establishes "a strong and statistically significant relationship between the volume of accessories purchased by Dealers and the number of discretionary and turndown cars they subsequently purchased." Pls.' App. at Tab 91, Neels Report at 19. According to Dr. Neels, "[d]epending upon the model one considers, [the data] show[s] that $1,000 per car in accessory purchases results in a dealer receiving, on average, from 1.6 to 4.3 additional discretionary cars in subsequent allocations, and from 1.5 to 3.3 additional turndown cars. In all cases, the results were statistically significant, indicating that they represent systematic effects, and are highly unlikely to be the result merely of random variation." *Id.*

Plaintiffs' anecdotal evidence consists primarily of statements obtained from dealers and former employees of SNE. Some of these statements specifically allege that SNE's district managers conditioned access to turndown and discretionary vehicles on a dealer's agreement to purchase accessories for regular allocation vehicles. *See* Pls.' App. Tab 21, Prevatt Depo. at 107–08; Tab 43, Smith Oral Aff. at 13; Tab 17, Marino Depo. at 105–06. Other statements describe additional techniques that district managers used to induce dealers to purchase accessories. For example, district managers sometimes altered the color and model mix of vehicles assigned to particular dealers or otherwise tampered with computer-based allocations. *See* Pls.' App. at Tab 21, Prevatt Depo. at 47–48. On other occasions, district managers refused to fill "sold orders" from dealers who did not purchase enough accessories.[5] Pls.' App. at Tab 25a, Smith Depo. at 97–98. District managers allegedly also told dealers that they would suffer in unspecified ways if they did not purchase accessories for regular allocation vehicles.

## D. *Concealment*

Plaintiffs assert that SNE repeatedly misled them concerning its conditioning practices. On November 21, 1996, Appelbe and SNE employee, Richard Cirami, sent a letter to the dealers stating that "*accessories are strictly optional!* You do not have to purchase *any* accessories on any Subaru you purchase from SNE . . . ." Pls.' App., Tab 54 (original emphasis). At a dealers' advisory board meeting on October 23, 1996, SNE's representatives informed the dealers that "no vehicles will be pre-accessorized in the future with the exception of Safari and Rally [models] which the dealers will receive one introductory vehicle and then order as they desire." Pls.' App., Tab 53. In a March 10, 1998 letter to dealer Thomas Camilleri, an SNE representative similarly stated that "[y]ou are always entitled to purchase vehicles with or without port installed accessories . . . ." Pls.' App., Tab 58. Plaintiffs contend that these statements were false because SNE concedes that it selected the accessories that were installed on discretionary and turndown vehicles, and the above-cited evidence demonstrates that

---

**5.** A "sold order" results when a dealer sells a car that the dealer does not presently have on his lot, but that SNE lists in its inventory. The dealer submits the "sold order" to SNE for fulfillment.

dealers also were coerced into purchasing accessories for regular allocation vehicles.

## II. *ANALYSIS*

Plaintiffs' claims can be grouped into three categories for purposes of analysis. The first category consists of claims challenging both SNE's admitted practice of conditioning access to turndown and discretionary vehicles on a dealer's agreement to purchase accessories for those vehicles, and its alleged practice of conditioning access to turndown and discretionary vehicles on a dealer's agreement to purchase accessories for regular allocation vehicles.[6] The second category consists of claims that defendants misled them concerning SNE's conditioning practices. The third category includes claims alleging that defendants used other coercive means in addition to conditioning to induce dealers to purchase accessories.

In the sections that follow, I offer my reasons for concluding that plaintiffs' first and second category claims are not viable. I also explain why plaintiffs' third category claims may not be amenable to class action treatment. In brief, I conclude that SNE's conditioning practices do not violate the ADDCA or the state dealer acts and will not support a RICO extortion claim because they are not coercive; they do not violate the antitrust laws because SNE lacks market power in the relevant tying product market; and they do not breach SNE's dealer agreements because they are not unlawful, unethical, or inequitable. Plaintiffs' second category claims fail because plaintiffs cannot demonstrate that

they were injured by SNE's alleged fraud scheme. Finally, although plaintiffs have produced evidence that conceivably could support many of their third category claims, those claims are subsidiary to the first category claims and, by themselves, may not warrant class action treatment because common questions do not predominate and a class action would not be superior to other forms of adjudication.

I explain my reasoning as it bears on each category of claim in turn.

### A. *First Category Claims*

#### 1. **The ADDCA and State Dealer Acts**

Plaintiffs claim that SNE's conditioning practices violate the ADDCA and the state dealer acts. I evaluate these claims by first describing the federal and state statutes on which the claims are based.

##### a. *The ADDCA*

The ADDCA provides automobile dealers with a cause of action for damages resulting from a manufacturer's failure "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with [the] dealer."[7]  15 U.S.C. § 1222 (1998).  The term "good faith" is defined as:

> the duty ... to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation,

---

**6.** I refer to both forms of conditioning collectively as SNE's "conditioning practices."

**7.** SNE does not challenge plaintiffs' contention that it is an "automobile manufacturer" as that term is defined in the ADDCA. *See* 15 U.S.C. § 1221(a) (1998) (an automobile manufacturer is "any person, partnership, corporation, association or other form of business

enterprise engaged in the manufacturing or assembling of passenger cars, trucks, or station wagons, including any person, partnership, or corporation which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles").

endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e) (original emphasis).

■ The First Circuit has determined that good faith under the ADDCA has a " 'limited and restricted meaning.' " *H.D. Corp. of P.R. v. Ford Motor Co.*, 791 F.2d 987, 990 (1st Cir.1986) (quoting *Wallace Motor Sales, Inc.*, 780 F.2d 1049, 1056 (1st Cir.1985)). Lack of good faith " 'must be found in the context of actual or threatened coercion or intimidation.' " *Id.* The " 'coercion or intimidation must include a wrongful demand that would result in penalties or sanctions if not complied with.' " *Id.* Further, it " 'must be actual; the mere fact that a dealer may have felt it had been coerced or intimidated is not sufficient.' " *Id.*

### b. *The State Dealer Acts*

All of the states in which SNE operates have enacted statutes which, like the ADDCA, are designed to protect dealers from coercive and other unreasonable practices by manufacturers. New Hampshire's dealer statute is typical. It provides, in pertinent part, that it is unlawful for a manufacturer to "coerce or attempt to coerce" any dealer to

Order or accept delivery of any motor vehicle or vehicles, appliances, equipment, parts or accessories therefor, or any other commodity not required by law, which such motor vehicle dealer has not voluntarily ordered, or order or accept delivery of any motor vehicle with special features, appliances, accessories or equipment not included in the list price of such motor vehicles as publicly advertised by their manufacturer ....

N.H.Rev.Stat. Ann. ("RSA") § 357–C:3 (1995 & Supp.2002).[8]

The Maine, Massachusetts, and Rhode Island dealer acts similarly make it unlawful for a manufacturer to "coerce, or attempt to coerce" a dealer to purchase accessories.[9] Maine Rev. Stat. Ann. tit. 10, § 1174(2) (1997 & Supp.2002);[10] Mass. Gen. Laws Ann. Ch. 93B § 4(2)(1997 & Supp.2003);[11] R.I. Gen. Laws § 31–5.1–4(b) (2002). The Connecticut dealer act makes it unlawful for a manufacturer to "require" a dealer to purchase accessories, Conn. Gen.Stat. Ann. § 42–133bb (2003), and the Vermont dealer act makes it unlawful for a manufacturer to "require or to coerce" a dealer to purchase accessories, Vt. Stat. Ann. tit. 9 § 4096 (2002).

Plaintiffs argue that they need not prove that SNE's conduct was coercive to support their state dealer act claims. They base this argument on the First Circuit's

---

8. Unlike the other New England states which leave the term "coerce" undefined, New Hampshire defines the term as "the failure to act in a fair and equitable manner in performing or complying with any terms or provisions of a franchise or agreement; provided, however, that recommendation, persuasion, urging or argument shall not be synonymous with 'coerce' or lack of 'good faith'." RSA 357–C:1, XX.

9. Maine omits the comma: "coerce or attempt to coerce." Maine Rev. Stat. Ann. tit. 10, § 1174(2) (1997 & Supp.2002).

10. The Maine Legislature amended the Maine dealer act in 1997 to also state that "[t]he

allocation of new motor vehicles in the State must be made on a fair and equitable basis." Maine Rev. Stat. Ann. tit. 10, § 1174(3)(A) (Supp.2002). Plaintiffs do not base their dealer act claims on this provision.

11. The Massachusetts legislature amended the Massachusetts dealer act in 2002 to specifically allow distributers to use up to 15% of all vehicles for discretionary purposes. Mass. Gen. Laws Ann. Ch. 93B § 4(b) (1997 & Supp.2003). Since this amendment was not in effect during the class period, it does not alter my analysis.

decision in *General GMC, Inc. v. Volvo White Truck Corp.*, 918 F.2d 306 (1st Cir. 1990), which concluded that the Massachusetts dealer act "may encompass broader conduct ... than mere coercion and intimidation." *Id.* at 308. Plaintiffs' reliance on this excerpt is misplaced, however, because the First Circuit was applying § 4(1) of the Massachusetts dealer act, which broadly prohibits "any action which is arbitrary, in bad faith, or unconscionable ...", *id.* (quoting Mass. Gen. L. Ch. 93B, § 4(1)), rather than § 4(2), which is at issue here and which requires proof that a manufacturer "coerced or attempted to coerce" a dealer to purchase accessories.[12] Obviously, I cannot ignore the coercion requirement contained in § 4(2) of the Massachusetts act and all but two of the other dealer acts simply because other sections of the acts do not require proof of coercion. Accordingly, I reject plaintiffs' contention that coercion is not an element of those state dealer acts that expressly require proof of coercion.

Plaintiffs argue in the alternative that even if coercion is a necessary element of an accessory conditioning claim under most of the state dealer acts, their use of the term does not require a wrongful demand and a threat of sanctions as is the case under the ADDCA. Plaintiffs thus appear to assert that a manufacturer

acts coercively whenever it conditions access to anything of value on a dealer's agreement to purchase accessories. I also reject this argument. The accessory purchase provisions of the state dealer acts were enacted in part to prevent manufacturers from using improper economic pressure to force dealers to purchase accessories. Nothing in the language, structure, or legislative history of the acts suggests that they were designed to also prohibit manufacturers from engaging in the generally accepted business practice of offering incentives to encourage dealers to purchase accessories. Accordingly, if a state dealer act requires proof of coercion, I construe that requirement to embody the same type of coercion as is required under the ADDCA. *See Colonial Dodge, Inc. v. Chrysler Corp.*, 11 F.Supp.2d 737, 744 (D.Md.1996) (noting that "'coercion' under both the [Maryland Dealer Act] and the ADDCA embodies the same concept, and accordingly the same analysis applies.").[13]

### c. *Analysis*

As I have noted, coercion under both the ADDCA and the state dealer acts requires a wrongful demand coupled with a threat of sanctions. The clearest cases of coercion under this definition are those in which a manufacturer threatens to withhold what it knows to be a dealer's proper-

---

**12.** These provisions were recodified by the 2002 amendment to the act. *See* Mass. Gen. Laws Ann. Ch. 93B § 4(b) (1997 & Supp. 2003).

**13.** Plaintiffs have not offered a distinct argument based on the text of either the Connecticut dealer act, which makes it unlawful for a manufacturer to "require" the purchase of accessories, Conn. Gen.Stat. Ann. § 42–133bb, or the Vermont dealer act, which makes it unlawful for a manufacturer to "require or to coerce" such purchases, Vt. Stat. Ann. tit. 9 § 4096. This is understandable because, while neither act expressly requires proof of coercion, the accessory purchase

provisions of both acts share the same legislative purpose as the other dealer acts at issue in this case: that is, to prevent manufacturers from using undue economic pressure to compel dealers to purchase accessories. Thus, while I recognize that a manufacturer would violate both states' acts if it required dealers to purchase accessories to obtain a dealership or to obtain something of value to which the dealer is otherwise entitled, I do not construe either act to ordinarily bar a manufacturer from requiring that dealers purchase accessories in order to obtain a benefit to which the dealer is not otherwise entitled.

ty if the dealer refuses to comply with the manufacturer's demands. Such conduct necessarily is coercive because the manufacturer is using an unlawful threat to induce compliance with the manufacturer's demands. In contrast, a manufacturer's offer of incentives to induce compliance ordinarily is not coercive because the dealer has no entitlement to the property that the manufacturer is offering to provide. *See, e.g., Cabriolet Porsche Audi, Inc. v. Am. Honda Motor Co.*, 773 F.2d 1193, 1210 (11th Cir.1985) (offer of extra vehicles from a pool of discretionary vehicles is not coercive); *Colonial Dodge*, 11 F.Supp.2d. at 744 (same). This case appears to qualify as a permissible use of incentives rather than an impermissible use of sanctions under this dichotomy because plaintiffs agree that they had no contractual right to receive either turndown or discretionary vehicles.

■ Plaintiffs nevertheless offer two arguments to support their claim that SNE's conditioning practices were coercive. First, they assert, without offering any argument or supporting authority, that even if SNE can control the allocation of turndown and discretionary vehicles for most purposes, it cannot use the allocation process for "the legislatively forbidden purpose of selling unwanted accessories." Pls.' Mem. at 41. The difficulty with this argument is that it finds no support in the statutory language on which it is based. Neither the ADDCA nor the state dealer acts bar all means by which manufacturers may attempt to sell dealers unwanted accessories. Rather, they merely forbid the use of coercive means to effect such sales. Thus, I reject plaintiffs' claim that SNE's practices are coercive solely because they allegedly were developed to encourage dealers to purchase accessories.

■ Plaintiffs next contend that even if the ends that SNE's alleged conditioning practices were designed to achieve do not make its practices coercive, its chosen means—the use of its power to allocate turndown and discretionary vehicles—is coercive. This argument begins with the major premise that an otherwise permissible incentive program will be deemed to be coercive if it threatens to deny dealers access to resources that they require to conduct their operations. It then proceeds with the minor premise that plaintiffs required access to turndown and discretionary vehicles to conduct their operations. I accept the major premise that underlies plaintiffs' argument. For example, I agree that a manufacturer's threat to deny access to all or substantially all vehicles to dealers who refuse to purchase accessories would be coercive regardless of whether the manufacturer was contractually entitled to allocate vehicles to dealers of its choosing. I ultimately am unpersuaded by plaintiffs' argument, however, because the facts do not support their minor premise. In other words, the power that SNE retained under Fair Share II to control the allocation of turndown and discretionary vehicles simply was not sufficient to qualify SNE's use of that power as coercive.

Plaintiffs do not challenge SNE's contention that its dealers for the most part were highly successful during the class period when compared both with other Subaru dealers and other automobile dealers in general. While uncooperative dealers might have received fewer of the most desirable vehicles to sell and thus may have faced the prospect of smaller allocations if, as a result, they failed to sell vehicles as rapidly as their more cooperative peers, the record is devoid of evidence suggesting that SNE's conditioning practices threatened any dealer's ability to conduct successful business operations. The mere fact that uncooperative dealers may have fared less well under Fair Share II

than those who agreed to accept the conditioning practices, does not mean that SNE's use of the practices was coercive. An incentive program does not become coercive merely because it produces losers as well as winners. Here, the fact that more than 88% of all vehicles were initially allocated to dealers without regard to their accessory purchases belies any claim that SNE's conditioning practices threatened to deny dealers access to vehicles that they need to conduct viable business operations.[14] Thus, I reject plaintiffs' claim that the conditioning practices violated either the ADDCA or the state dealer acts.

### 2. Hobbs Act Claims

The dealers identify three distinct RICO claims in their second amended complaint. In Count I they claim that SNE is liable because it conducted or participated in the conduct of an enterprise through a pattern of racketeering. *See* 18 U.S.C. § 1962(c) (2000). They charge in Counts II and III that Boch and Appelbe, respectively, are liable on the same theory. *See* 18 U.S.C. § 1962(c). All three claims are based on plaintiffs' assertion that the defendants violated the Hobbs Act by extorting the dealers through their option-packing scheme and committing various acts of mail and wire fraud to conceal the existence of the scheme. I deal here with plaintiffs' claim that SNE's conditioning practices qualify as extortion.

▆▆▆▆ The Hobbs Act imposes criminal penalties on any person who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion." 18 U.S.C. § 1951(a). The act

defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." *Id.* at § 1951(b)(2). Fear of economic loss, generally called "economic fear," is included within the meaning of the statutory term "fear." *See, e.g., United States v. Hathaway,* 534 F.2d 386, 394 (1st Cir.1976). Not every business use of economic fear, however, is inherently unlawful. *See United States v. Sturm,* 870 F.2d 769, 773 (1st Cir.1989). "Indeed, the fear of economic loss is a driving force of our economy that plays an important role in many legitimate business transactions." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 523 (3rd Cir.1998). One court has distinguished between legitimate and illegitimate uses of economic fear by stating:

> In a 'hard bargaining' scenario the alleged victim has no pre-existing right to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant, but in an extortion scenario the alleged victim has a pre-existing entitlement to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant.

*Id.* at 525 (quoting *Viacom Int'l, Inc. v. Icahn,* 747 F.Supp. 205, 213 (S.D.N.Y. 1990), *aff'd on other grounds,* 946 F.2d 998 (2d Cir.1991)). I agree with this reasoning.

▆▆▆▆ As I have already noted, plaintiffs had no pre-existing right to either turn-down or discretionary vehicles. Thus, SNE's alleged threat to withhold access to

---

**14.** Plaintiffs also allege that initial allocation vehicles were not distributed fairly. While I agree that, if proved, such conduct might well be unlawful, I am not convinced that those claims are amenable to class action treatment. Since much of the evidence is anecdotal and dealer or district manager specific, I treat those allegations as category II claims, and analyze them below.

such vehicles unless a dealer agreed to purchase accessories does not give rise to the kind of economic fear that the Hobbs Act was designed to address. Accordingly, defendants are entitled to summary judgment to the extent that plaintiffs' RICO claims are based on the assertion that SNE's alleged conditioning practices qualify as extortion under the Hobbs Act.

### 3. Antitrust Claims

Plaintiffs argue that defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1 (1996), and Section 3 of the Clayton Act, 15 U.S.C. § 14 (1997), by illegally tying the sale of turndown and discretionary vehicles to the purchase of accessories for both these vehicles and regular allocation vehicles. To prove what they assert is a *per se* violation of the antitrust laws, plaintiffs must demonstrate that: (1) their claim concerns both a "tying" product, in this case, Subaru vehicles, and a distinct "tied" product, in this case, accessories; (2) SNE conditioned the sale of Subaru vehicles on the purchase of accessories; (3) SNE has sufficient market power in the relevant market for Subaru vehicles to appreciably restrain trade in the market for accessories; and (4) as a result, SNE was able to foreclose a not insubstantial amount of interstate commerce in the market for accessories. *See Borschow Hosp. and Med. Supplies, Inc. v. Cesar Castillo, Inc.,* 96 F.3d 10, 17 (1st Cir.1996); *ABA Antitrust Law Developments,* 179 (5th ed.2002) (setting forth elements of a *per se* tying claim).

Defendants challenge plaintiffs' tying claim by arguing that they cannot prove that SNE had market power in the relevant tying product market. They begin their argument by defining the relevant market as the New England market for new vehicles. They then cite the First Circuit's decision in *Grappone v. Subaru of New England, Inc.,* 858 F.2d 792, 797–98 (1st Cir.1988), for the proposition that SNE lacks market power in the new vehicle market. Plaintiffs respond by claiming that defendants have misidentified the relevant tying product market. Relying on the Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), they claim that the relevant market should be limited to the New England market for new Subaru vehicles because they have been "locked-in" to the purchase of Subaru vehicles by their dealer agreements and the significant costs that they have incurred to establish their dealerships. They assert that SNE has market power in this more narrowly defined market because SNE is the exclusive distributor of new Subaru vehicles in New England.

As I explain in greater detail below, I reject plaintiffs' argument because it mistakenly confuses the contract power that SNE has acquired by virtue of its dealership agreements with the market power that SNE must possess before it can be held liable for a tying violation. To explain my thinking, I begin by describing the First Circuit's decision in *Grappone* and the Supreme Court's decision in *Kodak.* I then explain why *Kodak* does not apply in cases such as this where a distributor's power to require a dealer to purchase one product in order to obtain another arises from a contractual commitment, rather than market forces.

#### a. *Grappone*

In *Grappone,* a Subaru dealer brought a tying claim against SNE alleging that it had conditioned vehicle allocation on the dealer's agreement to purchase spare parts. *See id.* at 793. In rejecting this claim, the court determined that the dealer had failed to show that "Subarus had any

special or unique features, such as patents or copyrights, that might demonstrate market power." *Id.* at 798. The court also concluded that SNE lacked market power in the new vehicle market because, its market share in that market was "minuscule" and thus SNE lacked the power to raise prices for its vehicles above a competitive level. *Id.* at 797–98. The First Circuit accordingly concluded that the dealer had "failed to prove that the *per se* anti-tying rules apply in this case." *Id.* at 800.

### b. *Kodak*

In *Kodak*, which was decided several years after *Grappone*, the Supreme Court was presented with a case in which a manufacturer allegedly used market power in an aftermarket for unique replacement parts to compel purchasers of the replacements parts to also purchase maintenance and repair services from *Kodak*.

Kodak manufactured and sold photocopiers and micrographic equipment. *See Kodak*, 504 U.S. at 455, 456, 112 S.Ct. 2072. It also sold two aftermarket products related to its equipment: replacement parts and service. *See id.* at 455, 457, 112 S.Ct. 2072. After many customers had already purchased Kodak equipment, numerous independent service organizations (ISOs) began to offer service for Kodak's machines at a lower price than that charged by Kodak. *See id.* at 455, 457, 112 S.Ct. 2072. Kodak reacted by tying the availability of its replacement parts, which were the only parts that could be used in servicing its machines, to the purchase of service from Kodak. *See id.* at 457, 458, 112 S.Ct. 2072. As a result, the ISOs were no longer able to compete with Kodak in the market for equipment servicing. *See id.* at 458, 112 S.Ct. 2072.

A group of ISOs sued Kodak, claiming, *inter alia,* that Kodak had tied the sale of replacement parts to the purchase of maintenance and repair services, in violation of § 1 of the Sherman Act. *See id.* at 459, 112 S.Ct. 2072. In response, Kodak insisted that it was entitled to judgment as a matter of law because the existence of competition in the equipment market, which was conceded, necessarily meant that there must be competition in the derivative aftermarket for replacement parts. *See id.* at 465–66, 112 S.Ct. 2072. Therefore, Kodak argued, it lacked sufficient power in the market for replacement parts (the "tying product") to commit a *per se* tying violation. *See id.* Kodak's proposed legal rule-that "equipment competition precludes any finding of monopoly power in derivative aftermarkets," *id.* at 466, 112 S.Ct. 2072 (internal quotation marks omitted)-stemmed from an assumption about the perfect operation of the "cross-elasticity of demand" between the primary equipment market and the derivative aftermarkets. *Id.* at 469, 112 S.Ct. 2072 (internal quotation marks omitted).

The Court rejected Kodak's contention, concluding instead that "there is no immutable physical law-no 'basic economic reality'-insisting that competition in the equipment market cannot coexist with market power in the aftermarkets." *Id.* at 471, 112 S.Ct. 2072. Rather, the court held that the ISOs were entitled to the opportunity to prove that two factors-"information costs" and "switching costs"-"foil[ed] the simple assumption that the equipment and service markets act as pure complements to one another." *Id.* at 477, 112 S.Ct. 2072. The Court determined that information costs could undermine the "cross-elasticity of demand" between the equipment market and derivative aftermarkets if consumers who purchased Kodak equipment lacked the information necessary to calculate the total "life-cycle" cost of the equipment, including the cost of

tied parts and service, at the time that they decided which manufacturer's machines to purchase. *See id.* at 473–76, 112 S.Ct. 2072. The Court also reasoned that consumers who purchased Kodak equipment might be willing to pay supra-competitive prices for Kodak service in order to get the replacement parts they needed to maintain their original investment in the equipment, particularly if their only alternative was to switch to another manufacturer's machines and thereby abandon the substantial investment already made in the Kodak equipment. *See id.* at 476–77, 112 S.Ct. 2072.

■■■ *Kodak* has spawned several judicial decisions which consider whether power acquired as a result of a contractual lock-in can be equated with the market power that is required to support a tying claim. Although not all courts and commentators agree, the prevailing view is that a contractual lock-in ordinarily does not give rise to concerns that the antitrust laws were enacted to address. *See, e.g., Maris Distrib. Co. v. Anheuser–Busch, Inc.,* 302 F.3d 1207, 1222 (11th Cir.2002); *Hack v. President and Fellows of Yale College,* 237 F.3d 81, 85 (2d Cir.2000); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 438 (3d Cir.1997); *United Farmers Agents Assoc., Inc. v. Farmers Ins. Exchange,* 89 F.3d 233, 236–37 (5th Cir.1996); Tony Lin, *Distinguishing Kodak Lock-in and Franchise Contractual Lock-in,* 28 S. Ill. U. L.J. 87 (1998); Alan H. Silberman, *The Myths of Franchise "Market Power",* 65 Antitrust L.J. 181 (1996); *but see* Benjamin Kline, *Market Power in Franchise Cases in the Wake of Kodak: Applying Post–Contractual Hold-up Analysis to Vertical Relationships,* 67 Antitrust L.J. 283 (1999).

### c. *Application*

■■■ Plaintiffs do not question the First Circuit's conclusion in *Grappone* that SNE lacks market power in the New England vehicle market. Nor do they take issue with the prevailing view that contract power ordinarily cannot, by itself, establish the market power necessary to support a tying claim. Nevertheless, they argue that the relevant tying product market in this case should be limited to the market for Subaru vehicles because SNE locked them in to their dealerships by misleading them into believing that accessories were optional.[15] In other words, plaintiffs contend that power acquired through a contractual lock-in may substitute for market power if the lock-in was induced by misrepresentation. I reject this contention.

A contractual lock-in of the type at issue here does not adversely affect either consumers or competitors in the absence of true market power, regardless of whether the lock-in was induced by misrepresentation or was the result of good faith negotiation. *See* Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, *Antitrust Law* (2d ed.2002) ¶ 519 at 149–50. If, as plaintiffs concede was the case, the new vehicle market was competitive during the class period, SNE could not have induced consumers to pay inflated prices for Subarus simply because its dealers were contractually locked in to their dealerships. Nor

---

**15.** Defendants dispute plaintiffs' claim that they were locked into the purchase of Subaru vehicles. To support their position, defendants note that Subaru dealers are free to own other dealerships; that they may terminate their dealerships at any time on 60–days notice; that SNE must purchase most inventory and Subaru specific tools when a distrib-

utorship is terminated; and that dealerships and the real estate investments that have been made by dealers to develop their dealerships are readily saleable. While this argument may well have merit, I nevertheless accept for purposes of analysis plaintiffs' contention that they were contractually locked into the purchase of Subaru vehicles.

could SNE have used its alleged power over vehicle allocation to foreclose a significant portion of an otherwise competitive market for accessories. While the dealers may have suffered if, as they claim, SNE fraudulently induced them to sign their dealer contracts and incur substantial costs in building their dealerships, the law of fraud, misrepresentation, and unfair competition exists to address such concerns. *See id.* at 149 (rejecting view that contractual lock-in claim is viable as a tying claim if "the lock-in occurs as a result of seller misrepresentation"). In short, no purpose would be served in turning antitrust law into a substitute for this well-established body of state law. *See id.* Thus, I cannot permit plaintiffs to redefine the relevant market as the market for new Subaru vehicles merely because the dealers claim that SNE induced them to acquire their dealerships through a pattern of deception.

Because plaintiffs have failed to demonstrate that SNE has appreciable market power in the relevant tying product market, their tying claim fails.

#### 4. Contract Claim

■■■ Plaintiffs assert that SNE's conditioning practices breached its contractual obligations to allocate vehicles "equitably" and to generally behave "in a lawful and ethical manner." Defendants respond by claiming its practices were not unlawful, unethical, or inequitable because (1) the practices do not violate state or federal law; (2) most vehicles were allocated using the allocation formula specified in Fair Share II; and (3) Fair Share II, which specified the manner in which SNE was required to implement its duty to allocate vehicles equitably, expressly authorized SNE to use discretionary vehicles for market actions such as encouraging incentive purchases and did not prohibit SNE from

using turndown vehicles for the same purposes. Plaintiffs' only response to these arguments is to claim in a conclusory fashion that "[d]efendants illegal, coercive and deceptive conduct violates SNE's promises" to "allocate vehicles fairly and equitably" and to at all times behave in a "lawful and equitable manner." Pls.' Mem. at 75. This is not an acceptable response.

As I have already explained, SNE's conditioning practices did not violate the ADDCA, the state dealer acts, the Hobbs Act, or the federal antitrust laws. Moreover, its use of discretionary vehicles to encourage market actions such as the purchase of accessories was expressly authorized by Fair Share II, and its reservation of the right to allocate turndown vehicles to dealers of its choosing did not violate the dealer agreements because these vehicles had already passed through the agreed-upon allocation system. Finally, it is undisputed that more than 88% of all vehicles were initially allocated under Fair Share II using a formula that did not take into account whether a dealer had agreed to purchase accessories. Under these circumstances, I fail to see how SNE's conditioning practices were illegal, unethical, or inequitable.

### B. Second Category Claims

■■■ Plaintiffs' second category claims allege civil RICO violations arising from a pattern of mail and wire fraud. The alleged fraud scheme on which these claims are based was a scheme to conceal from dealers the existence of SNE's alleged option-packing scheme. As I explain below, these claims fail for the simple reason that plaintiffs have failed to demonstrate that they were injured as a result of the fraud scheme. *See Bonilla v. Volvo Car Corp.,* 150 .F.3d 62, 66 (1st Cir.1998); *see also Sys. Mgmt., Inc. v. Loiselle,* 303 F.3d 100, 104 (1st Cir.2002) (assuming that plaintiff

must prove both "but for" and proximate causation to support a civil RICO claim based on mail fraud).

Plaintiffs assert that defendants' fraud scheme caused them three types of injuries: (1) costs incurred to purchase unwanted accessories; (2) costs incurred to pay floor plan interest for vehicles that took longer to sell because they were equipped with accessories; and (3) reductions in the value of their dealerships. Plaintiffs have failed to explain how the alleged fraud scheme could have contributed in any substantial way to any of these claimed injuries. Any added costs that plaintiffs may have incurred to purchase unwanted accessories or to pay floor plan interest on vehicles that took longer than expected to sell would have been directly caused by the option-packing scheme rather than the fraud scheme. The fraud scheme could only have substantially contributed to these injures if it caused dealers to lock themselves in their dealer contracts on the basis of a mistaken impression that the option-packing scheme had been discontinued. Plaintiffs have offered no evidence suggesting that any dealer signed a dealer contract or made a substantial investment in a dealership as a result of any of the allegedly fraudulent statements which give rise to their claims. Plaintiffs' assertion that the fraud scheme caused a diminution in the value of their dealerships fares no better because the expert witness that they have designated to testify on this issue states only that the dealerships decreased in value as a result of "the disparaging and litigious relationship of Subaru of New England and Mr. Boch," Pls.' Mem. at 66, rather than the fraud scheme.

Because plaintiffs have failed to show that they suffered any injury as a result of defendants' alleged fraud scheme, defendants are entitled to summary judgment with respect to plaintiffs' second category claims.

## C. *Third Category Claims*

When I certified this case for class action treatment, I devoted most of my attention to plaintiffs' first and second category claims. *See George Lussier Enters., Inc. v. Subaru of New England,* 2001 D.N.H. 143, at *18–*58, 2001 WL 920060 (2001). Because I have determined that these claims are no longer viable, it makes sense to reexamine my prior determination that class certification is warranted with respect to plaintiffs' third category claims.

### 1. Decertification Standard

■ A class certification order may be "altered or amended," Fed.R.Civ.P. 23(c)(1), if "upon fuller development of the facts, the original determination appears unsound." *See id.* at adv. committee notes. Consequently, I am "required to reassess [my] class rulings as the case develops." *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 140 (3rd Cir.1998); *see also Lamphere v. Brown Univ.,* 553 F.2d 714, 719 (1st Cir.1977) (Rule 23(c)(1) "provides for reconsideration of the [certification] decision as the case progresses."); *Boucher v. Syracuse Univ.,* 164 F.3d 113, 118 (2d Cir.1999). If it "appears that the requirements of Rule 23 are not in fact met" after the facts are developed and the case progresses, I may decertify the class. *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 572 (2d Cir.1982).

I apply this standard in reviewing plaintiffs' third category claims.

### 2. Analysis

■ Plaintiffs' third category claims consist of allegations that SNE's district managers used coercive means in addition to conditioning to compel dealers to purchase unwanted accessories. Unlike plain-

tiffs' conditioning claims, these claims depend entirely upon anecdotal evidence that SNE's district managers employed allegedly unlawful pressure tactics such as altering the color mix of vehicles assigned to uncooperative dealers, refusing to fill sell orders placed by such dealers, and threatening dealers that they would suffer in unspecified ways if they did not purchase accessories.

Although this evidence may support viable claims that certain district managers engaged in unlawful conduct when selling accessories to particular dealers, it does not justify an inference that district managers' misconduct was widespread or that class members experienced the misconduct in similar ways. Under these circumstances, I do not see how I could determine the viability of any class member's category three claims in a single trial. Instead, determining whether the allegedly coercive means used by a district manager in any particular case were, in fact, unlawful will require a fact-intensive inquiry into each dealer's interaction with particular district managers. Class action treatment ordinarily is not warranted for such claims because any attempt to resolve them in a common trial will break down into a series of individualized mini-trials on issues that will substantially predominate over issues common to the class. *See Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006 (1st Cir.1997).

Given my concern that plaintiffs' category three claims may not be appropriate for class action treatment, I see no point in attempting to resolve defendants' challenge to these claims at the present time. Instead, I deny defendants' summary judgment motion with respect to these claims without prejudice and direct plaintiffs to show cause on or before October 30, 2003 as to why I should not decertify the class with respect to these claims.

## III. CONCLUSION

For the reasons set forth in this Memorandum and Order, I deny plaintiffs' motion for summary judgment (doc. no. 381), grant defendants' motions for summary judgment (doc nos. 368, 369 and 370) with respect to plaintiffs' category one and two claims and deny their motions without prejudice with respect to plaintiffs' category three claims. I direct the plaintiffs to show cause on or before October 30, 2003 as to why I should not decertify the class with respect to plaintiffs' category three claims.

SO ORDERED.